1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

NO.

**VERIFIED COMPLAINT FOR
FORFEITURE *IN REM***

14

15

16

$436,924.86 IN UNITED STATES FUNDS
SEIZED FROM NORTHERN TRUST
INTERNATIONAL BANK CORPORATION
ACCOUNT NUMBER XXXXXXXX0230
ON BEHALF OF "THAMES POINT
MANAGEMENT, LTD.";

17

18

19

20

$90,925.19 IN UNITED STATES FUNDS
SEIZED FROM NORTHERN TRUST
INTERNATIONAL BANK CORPORATION
ACCOUNT NUMBER XXXXXXXX0230
ON BEHALF OF "THAMES POINT
MANAGEMENT, LTD.";

21

22

23

$1,921,766.22 IN UNITED STATES FUNDS
SEIZED FROM BANK OF AMERICA
ACCOUNT NUMBER XXXXXX1076 ON
BEHALF OF "THAMES POINT
MANAGEMENT, LTD.";

24

25

26

$311,071.88 IN UNITED STATES FUNDS
SEIZED FROM BANK OF
AMERICA ACCOUNT NUMBER
XXXXXX1076 ON BEHALF OF "THAMES
POINT MANAGEMENT, LTD.";

27

28

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 1
*U.S. v. $436,924.86 in U.S. Funds, et al.*

1  $569,090.62 IN UNITED STATES FUNDS
   SEIZED FROM WELLS
2  FARGO/WACHOVIA BANK ACCOUNT
   NUMBERS XXX-XXXXXXXXX0008,
3  XXXXXXXXXXXX9425,
   XXXXXXXXXXXX0008, AND
4  XXXXXXXXXXXX7878 ON BEHALF OF
   "THAMES POINT MANAGEMENT, LTD.";
5
   $69,943.66 IN UNITED STATES FUNDS
6  SEIZED FROM WELLS
   FARGO/WACHOVIA BANK ACCOUNT
7  NUMBERS XXX-XXXXXXXXX0008,
   XXXXXXXXXXXX9425,
8  XXXXXXXXXXXX0008, AND
   XXXXXXXXXXXX7878, ON BEHALF OF
9  "THAMES POINT MANAGEMENT, LTD.";
10 $850.00 IN UNITED STATES FUNDS
   SEIZED FROM WELLS
11 FARGO/WACHOVIA BANK ACCOUNT
   NUMBERS XXX-XXXXXXXXX0008,
12 XXXXXXXXXXXX9425,
   XXXXXXXXXXXX0008, AND
13 XXXXXXXXXXXX7878 ON BEHALF OF
   "THAMES POINT MANAGEMENT, LTD.",
14
                    Defendants.
15

16

17        COMES NOW Plaintiff United States of America, by and through Annette L.

18 Hayes, Acting United States Attorney for the Western District of Washington, and Lisca

19 N. Borichewski and Richard E. Cohen, Assistant United States Attorneys for said

20 District, and alleges:

21        I.        **NATURE OF THE ACTION**

22        1.        This is a Complaint for forfeiture *in rem* pursuant to 18 U.S.C. §

23 981(a)(1)(A) of the following funds (collectively, "Defendant Funds"), which were

24 involved in or traceable to international money laundering violations of 18 U.S.C. §

25 1956(a)(2)(A), and/or pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or

26 derived from proceeds traceable to illegal gambling business(es) in violation of

27 18 U.S.C. §§ 1084(a) and 1952(a), which are "Specified Unlawful Activities" ("SUAs")

28 as incorporated by 18 U.S.C. § 1956(c)(7)(A):

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 2
*U.S. v. $436,924.86 in U.S. Funds, et al.*

A.    $436,924.86 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on July 20, 2011 pursuant to federal seizure warrant MS11-115, representing all wires seized from Northern Trust International Bank Corporation Account Number XXXXXXXX0230, on behalf of "Thames Point Management, LTD.";

B.    $90,925.19 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on August 2, 2011 pursuant to federal seizure warrant MC11-123, representing all wires seized from Northern Trust International Bank Corporation Account Number XXXXXXXX0230, on behalf of "Thames Point Management, LTD.";

C.    $1,921,766.22 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on July 19, 2011 pursuant to federal seizure warrant MS11-114, representing all wires seized from Bank of America Account Number XXXXXX1076, on behalf of "Thames Point Management, LTD.";

D.    $311,071.88 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on August 2, 2011 pursuant to federal seizure warrant MS11-125, representing all wires seized from Bank of America Account Number XXXXXX1076, on behalf of "Thames Point Management, LTD.";

E.    $569,090.62 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on August 2, 2011 pursuant to federal seizure warrant MS11-117, representing all wires seized from Wells Fargo/Wachovia Bank Account Numbers XXX-XXXXXXXXX0008, XXXXXXXXXXXX9425, XXXXXXXXXXXX0008, and XXXXXXXXXXXX7878, on behalf of "Thames Point Management, LTD.";

F.    $69,943.66 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on July 22, 2011 pursuant to federal seizure warrant MS11-117, representing all wires seized from Wells Fargo/Wachovia Bank Account Numbers XXX-XXXXXXXXX0008, XXXXXXXXXXXX9425, XXXXXXXXXXXX0008, and XXXXXXXXXXXX7878, on behalf of "Thames Point Management, LTD.;" and

///
///
///

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 3
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

G.   $850.00 in UNITED STATES FUNDS, more or less, and all proceeds therefrom, seized on August 2, 2011 pursuant to federal seizure warrant MS11-124, representing all wires seized from Wells Fargo/Wachovia Bank Account Numbers XXX-XXXXXXXXX0008, XXXXXXXXXXXX9425, XXXXXXXXXXXX0008, and XXXXXXXXXXXX7878, on behalf of "Thames Point Management, LTD."

## II.   JURISDICTION AND VENUE

2.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355(a).

3.   This Court has venue over this action pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1395.

## III.   DEFENDANT PROPERTY

4.   The Defendant Funds are now, and during the pendency of this action will be, within the jurisdiction of this Court.

## IV.   FACTUAL BASIS FOR FORFEITURE

### A.   Background: Online Gambling.

5.   The online gambling industry is essentially a virtual casino. The websites, which include www.bodog.com and www.betus.com, act as the casinos and are located on computer servers all over the world. Similarly, the gamblers are also located all over the world. As long as a person has access to the internet, and the gambling site will accept their money, that person can gamble online.

6.   However, federal law prohibits interstate and foreign travel or transportation in aid of racketeering enterprises pursuant to 18 U.S.C. § 1952(a). Specifically prohibited is the use of the mail or any facility in interstate or foreign commerce with the intent to distribute the proceeds of any unlawful activity or to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity. The definition of "unlawful activity" specifically includes "any business enterprise involving gambling." 18 U.S.C. § 1952(b). 18 U.S.C. § 1952(a) is a Specified Unlawful Activity underlying international

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 4
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  money laundering violations pursuant to 18 U.S.C. § 1956(a)(2)(A).  Racketeering

2  activity is defined as any act, including gambling, that is chargeable under state law and

3  punishable by imprisonment for more than one year (i.e., a felony).  *See* 18 U.S.C. §

4  1961(1)(A).  In the state of Washington, online gambling is a felony offense:

> Whoever knowingly transmits or receives gambling information
> by...the internet, a telecommunications transmission system, or similar
> means, or knowingly installs or maintains equipment for the
> transmission or receipt of gambling information shall be guilty of a
> class C felony subject to the penalty set forth in RCW 9A.20.021.

9  R.C.W. § 9.46.240.  In Washington, violations of R.C.W. § 9.46.240, as set forth above,

10 are class C felonies punishable by a maximum sentence of confinement in a state

11 correctional institution for five years, or by fine.  *See* R.C.W. § 9A.20.021(c); *see also*

12 *Rousso v. State*, 239 P.3d 1084 (Wash. 2010) (ban on internet gambling in state of

13 Washington not an excessive burden on interstate commerce, and therefore did not

14 violate the dormant Commerce Clause).  Therefore, Washington state gambling

15 violations are also Specified Unlawful Activities in aid of racketeering enterprises

16 underlying international money laundering violations.

17      7.      There are different types of online gambling, including sports wagering.

18 However, federal law prohibits transmission of wagering information.  Specifically,

19 pursuant to 18 U.S.C. § 1084(a), it is illegal to use wire communications for the

20 transmission in interstate or foreign commerce of bets or wagers, or information assisting

21 in the placing of bets or wagers, on any sporting event.  Additionally, it is illegal to

22 transmit a wire communication that entitles the recipient to receive money or credit as a

23 result of bets or wagers, or for information assisting in the placing of bets or wagers.

24 Though 18 U.S.C. § 1084(b) specifically allows the transmission of wire communications

25 in interstate or foreign commerce for the purpose of placing bets or wagers (i.e., if the

26 transmission occurs between two states or other foreign entities where such activity is

27 legal), online gaming is illegal in the state of Washington, as provided above.  *See*

28 R.C.W. § 9.46.240.  Therefore, any interstate wire communications that occur in

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 5
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | Washington for the purpose of sports gambling are also a violation of federal law. In

2 | addition, 18 U.S.C. § 1084 is a racketeering predicate act under 18 U.S.C. § 1961(1)(B)

3 | and, as such, is also a Specified Unlawful Activity underlying international money

4 | laundering violations. *See* 18 U.S.C. § 1956(c)(7)(A).

5 |      8.     An individual seeking to gamble over the internet must create and fund an

6 | account with the online casino. This is done by first creating the casino account online

7 | (similar to signing up for an email account) and then funding that casino account. There

8 | are various methods of funding casino accounts: by credit card or debit card entered

9 | directly on the gaming website or via third party payment processors. Every credit card

10 | transaction has a 4-digit code tied to the transaction type, which is incriminating if

11 | associated with online gambling. Therefore, individual gamblers who want to make bets

12 | online must find ways to do so without having identifying information on the associated

13 | electronic transfer. As such, individual gamblers hire third party payment processors to

14 | make electronic transfers when both paying into the online gambling site and when

15 | seeking pay-out of their winnings. These third party transfers are often sent overseas, and

16 | the receiving party is frequently not the name of the online casino.

17 |      9.     After the individual deposits money into his or her online casino account or

18 | third party account, that credit will be posted online, and the individual player can begin

19 | to wager. The player can also withdraw or "cashout" from their online casino account.

20 | This disbursement of funds can take the form of checks mailed to the individual player or

21 | wire transfers received directly into the bank account of the online gambler.

22 | **B.**     **Thames Point Management, LTD. and Royal Bank of Scotland.**

23 |      10.     In the spring of 2011, a detective employed by the Seattle Police

24 | Department, using an undercover identity and based in the Western District of

25 | Washington, opened an online gambling account with the website www.betus.com. The

26 | undercover officer funded his gambling account by sending a Western Union wire

27 | transfer to an individual located in the Philippines as directed by www.betus.com. The

28 | undercover officer used the website to wager on sporting events numerous times.

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 6
*U.S. v. $436,924.86 in U.S. Funds, et al.*

11.     In May 2011, the undercover officer logged into his account at www.betus.com and placed a request for payout from the website as a result of this betting.  As part of this process, the undercover officer was instructed to complete an online banking form which requested that the undercover officer provide his bank account information—including the international banking code for his bank.  The undercover officer received a wire in the amount of more than $100.00 directly into his bank account. The wire details showed the originating bank as The Royal Bank of Scotland, located in London, United Kingdom. The wire further reflected that the funds were transferred from the Royal Bank of Scotland bank account of Thames Point Management, LTD., also located in London, United Kingdom ("TPM" or "Thames Point").

12.     The wire documentation showed that the funds, which represent the online gambling payout to the undercover officer, were routed through a "correspondent bank account" located in the United States that the Royal Bank of Scotland ("RBS") utilized to convert the funds from foreign currency to U.S. currency.  When making foreign transfers/transactions to individual bank accounts, RBS routinely used set "correspondent bank accounts" like the above-captioned accounts, which are used primarily to exchange foreign currency into U.S. currency.  This process happens almost immediately and the transferred funds do not reside in the "correspondent bank accounts" for very long before the funds are then ultimately transferred to individual bank accounts—as set forth in further detail below.  Therefore, TPM facilitated the transfer of illegal gambling funds from the United Kingdom to the U.S. for distribution into the U.S. bank accounts of illegal online gamblers: TPM utilized its bank account at RBS and, subsequently, RBS's "correspondent bank accounts" to transfer funds to and from individual bank accounts, including those located in the Western District of Washington, thereby bypassing the online gambling sites.

13.     More specifically, TPM is a third party payment processor on behalf of gambling websites, including www.bodog.com and www.betus.com.  TPM provided

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 7
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 │ RBS with individual bank account information, including the name of the banking

2 │ institutions and bank routing numbers. In exchange, TPM received a fee for each

3 │ transfer. The individual bank account holders then participated in illegal gambling

4 │ activity hosted by illegal, online gambling websites.

5 │　　　　14.　　On June 30, 2011, Will Marik, a detective with the King County Sheriff's

6 │ Office, Shoreline Police Department, and a United States Secret Service Task Force

7 │ Officer ("Detective Marik"), conducted a search for TPM with the United States

8 │ Treasury. The search revealed that Thames Point Management, LTD was not a licensed

9 │ money transmitter with the Financial Crimes Enforcement Network ("FINCEN").

10 │ Additionally, the Washington State Department of Financial Investigations revealed that

11 │ TPM is not licensed as a money transmitter in the state of Washington.

12 │　　　　15.　　Additionally, Detective Marik conducted a computer search for Thames

13 │ Point Management, LTD on June 30, 2011. A website belonging to the entity could not

14 │ be found. However, a website identified as www.gpwa.org referred to Thames Point

15 │ Management in the context of online gambling. The initials GPWA in the website,

16 │ www.gpwa.org, are an acronym for the "Gambling Portal Webmaster Association." The

17 │ website www.gpwa.org is a forum for individuals participating in online gambling to post

18 │ blogs or messages related to current online gambling issues. On this website, an

19 │ individual using the name "balagan9" and "Sandra" posted a message that she received a

20 │ payment from Thames Point, and she inquired if anyone else on the website had

21 │ information about this company. "Blagan9/Sandra" then posted an updated message that

22 │ she received a wire payment from Thames Point after gambling on www.betus.com.

23 │ **C.**　　**International Wire Transfers and Correspondent Bank Accounts**

24 │　　　　16.　　The international wire transfer of money often involves multiple steps

25 │ between the initiation of the transfer in one country and the actual receipt of funds by an

26 │ individual in another country. When a foreign bank sends an electronic payment to the

27 │ United States on behalf of their account holder, the foreign bank enlists the services of a

28 │ United States bank with whom the foreign bank maintains a "correspondent bank

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 8
*U.S. v. $436,924.86 in U.S. Funds, et al.*

1    account." As provided above, these correspondent bank accounts exist primarily to

2    facilitate the conversion of foreign currency between banks, and are usually offered by

3    large banks based in the U.S. that conduct business overseas. These correspondent

4    accounts are offered to foreign banks that wish to conduct business and transfer funds

5    into the U.S. banking system. Once the funds are transferred into a U.S. correspondent

6    bank account, the funds are converted to U.S. dollars and can be immediately forwarded

7    to numerous other U.S. bank customer accounts at different banks. Correspondent bank

8    accounts are specific to each foreign banking customer.  Therefore, for example, a Royal

9    Bank of Scotland correspondent bank account at Wells Fargo Bank in the U.S. can only

10   be used for Royal Bank of Scotland business.

11        17.     In making an international transfer of funds, the foreign bank transmits

12   funds to a "correspondent bank account" maintained by banks in the United States, where

13   the funds are converted from the foreign currency to U.S. currency. At this point, the

14   money resides within the U.S. banking system. The money is then forwarded to the

15   individual recipient U.S. bank accounts via the Federal Reserve Wire Transfer System

16   (FRWTS) or the Clearing House Interbank Payments System (CHIPS) wire transfer

17   system.  Therefore, the "correspondent bank account" does not hold any actual funds.

18   Rather, the funds are quickly, almost instantaneously, converted to U.S. currency and

19   then forwarded to their final destination in the United States.

20        18.     As provided above, Thames Point acted as a money processor on behalf of

21   gambling websites that include www.bodog.com and www.betus.com. Specifically,

22   Thames Point used the "correspondent bank accounts" set forth below to facilitate the

23   transfer of illegal gambling funds from the United Kingdom to the U.S. for distribution

24   into the U.S. bank accounts of online gamblers.

25   ///

26   ///

27   ///

28   ///

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 9
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

19. The "correspondent bank accounts" include the following:

  A. Northern Trust International Bank Corporation account number XXXXXXXX0230, located at Harborside Financial Center Plaza 3, Second Street, Suite 1400, Jersey City, New Jersey;

  B. Bank of America account number XXXXXX1076 located at 5701 Horatio Street, Utica, New York; and

  C. Wells Fargo Bank/Wachovia account numbers XXX-XXXXXXXXX0008, XXXXXXXXXXXX9425, XXXXXXXXXXXXX0008, XXX-XXXXXXXXX7878 located at 401 Market Street Philadelphia, Pennsylvania.

**(1) Correspondent Bank Account: Northern Trust International Bank Corporation**

20. As provided above, a Seattle Police Department detective used an undercover identity in the early 2011 to open an online gambling account with www.betus.com. At the direction of the website, the undercover officer funded his gambling via wire transfer and then placed numerous wagers on sporting events. In May 2011, the undercover officer requested a payout of his betting from his account at www.betus.com which instructed the officer to complete an online banking form by providing his bank account information and the international banking code for his bank. The undercover officer then received a wire in the amount of more than $100.00 directly into his bank account. The wire details showed the originating bank as RBS, which had transferred the funds from TPM's account at RBS and, further, that the payout to the undercover officer was routed through RBS's correspondent bank account at Northern Trust International Bank Corporation.

21. More specifically, banking records from Northern Trust International Bank Corporation ("Northern Trust") reflect that the funds received into the undercover bank account were transferred by TPM from RBS to a correspondent account maintained at Northern Trust in the United States. Bank records reflect the following additional

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 10
*U.S. v. $436,924.86 in U.S. Funds, et al.*

international wire transfers from TPM to Northern Trust correspondent bank account number XXXXXXXX0230 ("Northern Trust Correspondent Account"):

    a. In February 2011, there were 446 incoming wire transfers totaling $925,698.92. These funds were immediately transferred to 446 other bank accounts in the United States.

    b. In March 2011, there were 231 incoming wire transfers totaling $556,193.24. These funds were immediately transferred to 231 other bank accounts in the United States.

    c. In April 2011, there were 413 incoming wire transfers, totaling $949,904.23. These funds were immediately transferred to 413 other bank accounts in the United States.

    d. In May 2011, there were 441 incoming wire transfers totaling $825,681.70. These funds were immediately transferred to 441 other bank accounts in the United States.

    e. In June 2011, there were 372 incoming wire transfers totaling $744,547.15. These funds were immediately transferred to 372 other bank accounts in the United States.

    f. From July 1 to July 11, 2011, there were 94 incoming wire transfers totaling $202,541.24. These funds were immediately transferred to 94 other bank accounts in the United States.

    22.    In total, between February of 2011 and July 11, 2011, TPM sent 1,997 international wire transfers to the Northern Trust Correspondent Account, totaling $4,204,566.48. These funds were immediately transferred to other United States bank accounts. Bank records revealed that individuals located in Washington received at least the following sampling of wire transfers from TPM via the Northern Trust Correspondent Account:

    i.    On June 30, 2011, Detective Marik and Seattle Police Department Detective Dunn ("Detective Dunn") contacted a confidential source named "T.B." in Tacoma, Washington. "T.B." admitted to receiving a wire transfer from Thames Point in the amount of $5,000.00, which was deposited into "T.B.'s" Key Bank account on March 2, 2011. The wire came from The Royal Bank of Scotland into the

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 11
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

United States through the Northern Trust Correspondent Account. It was then transferred directly into "T.B.'s" Key Bank account. "T.B." admitted that these funds represented payouts for online betting on sporting events at www.betus.com.

ii. On July 8, 2011, Detective Marik contacted another confidential source named "L.G." in Tacoma, Washington. "L.G." admitted to receiving a wire transfer from Thames Point in the amount of $155.00, which was deposited into "L.G.'s" bank account on May 5, 2011. The wire came from The Royal Bank of Scotland into the United States through the Northern Trust Correspondent Account, and was then transferred directly into "L.G.'s" Sterling Savings Bank account. "L.G." admitted that these funds represented payouts for online betting on sporting events at www.betus.com.

iii. Detective Marik and Seattle Police Department Detective Chris Hansen ("Detective Hansen") further reviewed the international wire transfers from Thames Point that routed through the Northern Trust Correspondent Account. Between February 1, 2011 and July 2, 2011, Thames Point sent sixteen (16) additional wires, in the amount of $16,280.08, from their Royal Bank of Scotland account to Washington State residents, at their bank accounts located in the Western District of Washington.

iv. Detectives Marik and Hansen further reviewed the international wire transfers from Thames Point that routed through the Northern Trust Correspondent Account. Between March 1, 2011 and April 30, 2011, Thames Point sent four (4) additional wires, in the amount of $3,285.00, from their Royal Bank of Scotland account to Washington State residents, at their bank accounts located in the Eastern District of Washington.

**(2) Correspondent Bank Account: Bank of America**

23.     Information received from a confidential source indicated that TPM was also sending international wire transfers to the United States via Bank of America. Bank of America banking records revealed that TPM sent international wire transfers from RBS to Bank of America correspondent bank account number XXXXXX1076 (the "Bank of America Correspondent Account").

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 12
*U.S. v. $436,924.86 in U.S. Funds, et al.*

24.    Bank records reflect the following international wire transfers from TPM to the Bank of America Correspondent Account:

   a.  In February 2011, there were 293 incoming wire transfers totaling $982,202.69. These funds were immediately transferred to 293 other accounts in the United States.

   b.  In March 2011, there were 814 incoming wire transfers totaling $2,788,096.38. These funds were immediately transferred to 814 other accounts in the United States.

   c.  In April 2011, there were 1201 incoming wire transfers totaling $3,265,003.60. These funds were immediately transferred to 1201 other accounts in the United States.

   d.  In May 2011, there were 1168 incoming wire transfers totaling $2,640,262.99. These funds were immediately transferred to 766 other accounts in the United States.

   e.  In June 2011, there were 1289 incoming wire transfers totaling $3,854,687.32. These funds were immediately transferred to 959 other accounts in the United States.

   f.  From July 1, 2011 to July 5, 2011, there were 17 incoming wire transfers totaling approximately $625,000.00. These funds were immediately transferred to 17 other accounts in the United States.

25.    In total, during December 2010 to July 5, 2011, TPM sent 4780 wire transfers from their RBS account to the Bank of America Correspondent Account, totaling $13,622,832.69, and these funds were immediately transferred to other United States bank accounts.

26.    Bank records revealed that individuals located in the Western District of Washington received at least the following sampling of wire transfers from TPM via the Bank of America Correspondent Account:

   i.  On July 7, 2011, Detectives Dunn and Marik contacted a confidential source named "C.B." in Kent, Washington. "C.B." admitted to receiving a wire transfer from Thames Point. The wire transfer, in the amount of $2,500.00, was deposited into "C.B.'s" Bank of America account on May 11, 2011. The wire came from The Royal Bank of

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 13
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | Scotland into the United States through the Bank of America
2 | Correspondent Account. It was then transferred directly into "C.B.'s"
3 | Bank of America account. "C.B." admitted the funds represented
  | payouts for playing poker online at www.bodog.com.

4 | ii. On July 7, 2011, Detectives Dunn and Marik contacted another
5 | confidential source named "M.S." in SeaTac, Washington. "M.S."
6 | admitted to receiving three wire transfers from Thames Point. The first
7 | wire transfer, in the amount of $9,982.00 was deposited into "M.S.'s"
8 | Bank of America account on March 1, 2011. The second wire transfer,
9 | in the amount of $3,000.00, was deposited into "M.S.'s" Bank of
  | America account on April 5, 2011. The third wire transfer, in the
10 | amount of $2,946.00, was deposited into "M.S.'s" Bank of America
11 | account on May 18, 2011. The wires came from The Royal Bank of
12 | Scotland into the United States through Bank of America Correspondent
  | Account. They were then transferred directly into "M.S.'s" Bank of
13 | America account. "M.S." admitted that these funds represented payouts
  | for sportsbook wagering online at www.bodog.com.

14 | iii. On July 7, 2011, Detectives Dunn and Marik contacted another
15 | confidential source named "D.B." in SeaTac, Washington. "D.B."
16 | admitted to receiving a wire transfer from Thames Point. The wire
17 | transfer, in the amount of $2,500.00, was deposited into "D.B.'s" Bank
  | of America account on June 20, 2011. The wire came from The Royal
18 | Bank of Scotland into the United States through the Bank of America
19 | Correspondent Account. It was then transferred directly into "D.B.'s"
  | Bank of America account. "D.B." admitted that these funds represented
  | payouts for sportsbook wagering online at www.bodog.com.

20 | iv. Detectives Marik and Hansen further reviewed the international wire
21 | transfers from TPM that routed through the Bank of America
22 | Correspondent Account. Between May 1, 2011 and July 30, 2011,
23 | Thames Point sent two (2) additional wires, in the amount of
24 | $13,121.34, from their Royal Bank of Scotland account to Washington
  | State residents, at their bank accounts located in the Western District of
  | Washington.

25 | ///
26 | ///
27 | ///
28 | ///

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 14
*U.S. v. $436,924.86 in U.S. Funds, et al.*

**(3) Correspondent Bank Accounts: Wells Fargo/Wachovia Bank**

27.    In July 2011, the United States Secret Service ("USSS") Seattle Field Office received banking records, which revealed that Thames Point also used correspondent bank accounts at Wells Fargo Bank to facilitate the distribution of funds from Europe to the United States.  Based on this information, the USSS reviewed additional Wells Fargo Bank records for wire transfers conducted on behalf of TPM. As further detailed below, the banking records reflect that TPM transferred funds from RBS into the United States through the following correspondent bank accounts identified as:

a.   Wells Fargo Bank account numbers XXX-XXXXXXXXX0008 and XXX-XXXXXXXXX9425 located at 401 Market Street, Philadelphia, Pennsylvania; and

b.   Wachovia Bank account numbers XXX-XXXXXXXXX0008 and XXX-XXXXXXXXX7878 located at 401 Market Street, Philadelphia, Pennsylvania.

28.    Bank records reflect the following international wire transfers by TPM from RBS to Wells Fargo/Wachovia Bank account numbers XXX-XXXXXXXXX0008, XXX-XXXXXXXXX9425, XXX-XXXXXXXXX0008 and XXX-XXXXXXXXX7878 (the "Wells Fargo/Wachovia Correspondent Bank Accounts"):

a.   In February 2011, there were 7 incoming wire transfers totaling $67,949.11.  These funds were immediately transferred to 7 other bank accounts in the United States.

b.   In March 2011, there were 20 incoming wire transfers totaling $210,820.02. These funds were immediately transferred to 20 other bank accounts in the United States.

c.   In April 2011, there were 280 incoming wire transfers totaling $738,601.74. These funds were immediately transferred to 280 other banks accounts in the United States.

d.   In May of 2011, there were 38 incoming wire transfers totaling $162,271.50. These funds were immediately transferred to 38 other bank accounts in the United States.

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 15
*U.S. v. $436,924.86 in U.S. Funds, et al.*

e. In June 2011, there were 222 incoming wire transfers totaling $553,041.95. These funds were immediately transferred to 222 other bank accounts in the United States.

f. From July 1 to July 13, 2011, there were 111 incoming wire transfers totaling $224,240.36. These funds were immediately transferred to 111 other bank accounts in the United States.

29.     In total, during February 17, 2011 to July 13, 2011, TPM sent 660 international wire transfers to the Wells Fargo/Wachovia Correspondent Bank Accounts totaling $1,957,024.62.

30.     Bank records revealed that individuals located in the Western District of Washington received at least the following sampling of wire transfers from TPM via the Wells Fargo/Wachovia Correspondent Bank Accounts:

i.   On July 20, 2011, Detective Marik contacted a confidential source named "M.B." in Redmond, Washington. "M.B." admitted to receiving a wire transfer from Thames Point. The wire transfer, in the amount of $3,203.00, was deposited into "M.B.'s" Wells Fargo account on April 8, 2011. The wire came from The Royal Bank of Scotland into the United States through Wells Fargo correspondent bank account number XXX-XXXXXXXXX9425. It was then transferred directly into "M.B.'s" Wells Fargo Bank account. "M.B." admitted that these funds represented payouts for online betting on sporting events at www.bodog.com.

ii.  On July 20, 2011, Detectives Dunn and Marik contacted another confidential source named "A.H." in Renton, Washington. "A.H." admitted to receiving a wire transfer from Thames Point. The wire transfer, in the amount of $660.00, was deposited into "A.H.'s" bank account on April 13, 2011. The wire came from The Royal Bank of Scotland into the United States through Wells Fargo correspondent bank account number XXX-XXXXXXXXX9425. It was transferred directly into "A.H.'s" Wells Fargo Bank account. "A.H." admitted these funds represented payouts for online betting on sporting events at www.betus.com.

///
///

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 16
*U.S. v. $436,924.86 in U.S. Funds, et al.*

iii. Detectives Marik and Hansen further reviewed the international wire transfers from TPM that routed through the Wells Fargo correspondent bank account numbers XXX-XXXXXXXXX9425 and XXX-XXXXXXXXX0008. Between May 1, 2011 and June 30, 2011, Thames Point sent seven (7) additional wires, in the amount of $30,312.53, from their Royal Bank of Scotland account to Washington State residents, at their bank accounts located in the Western District of Washington.

31.     Based on the foregoing, TPM has utilized the "correspondent bank accounts" identified herein, committed, and aided and abetted in the transmission of wagering information and international money laundering in violation of 18 U.S.C. § 1084(a) and 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(a). As such, the Defendant Funds are subject to forfeiture to the United States.

## V.     LEGAL BASIS FOR FORFEITURE

32.     By reason of the foregoing, there is probable cause to believe that the above-captioned Defendant Funds are property involved in or traceable to international money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), and therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); and/or are property constituting or derived from proceeds of illegal gambling in violation of 18 U.S.C. §§ 1084(a) and 1952(a), as incorporated by 18 U.S.C. § 1956(c)(7)(A), and therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). As such, the funds contained in the following accounts are subject to forfeiture to the United States:

a. $436,924.86 in UNITED STATES FUNDS that were seized from Northern Trust International Bank Corporation Account Number XXXXXXXX0230 on behalf of "Thames Point Management, LTD.";

b. $90,925.19 in UNITED STATES FUNDS that were seized from Northern Trust International Bank Corporation Account Number XXXXXXXX0230 on behalf of "Thames Point Management, LTD.";

c. $1,921,766.22 in UNITED STATES FUNDS that were seized from Bank of America Account Number XXXXXX1076 on behalf of "Thames Point Management, LTD.";

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 17
*U.S. v. $436,924.86 in U.S. Funds, et al.*

1

2
   d. $311,071.88 in UNITED STATES FUNDS that were seized from Bank

3
      of America Account Number XXXXXX1076, on behalf of "Thames
Point Management, LTD.";

4

5
   e. $569,090.62 in UNITED STATES FUNDS that were seized from Wells

6
      Fargo/Wachovia Bank Account Numbers XXX-XXXXXXXXX0008,
XXXXXXXXXXXXX9425, XXXXXXXXXXXXX0008, and

7
      XXXXXXXXXXXXX7878, on behalf of "Thames Point Management,
LTD.";

8

9
   f. $69,943.66 in UNITED STATES FUNDS that were seized from Wells

10
      Fargo/Wachovia Bank Account Numbers XXX-XXXXXXXXX0008,
XXXXXXXXXXXXX9425, XXXXXXXXXXXXX0008, and

11
      XXXXXXXXXXXXX7878, on behalf of "Thames Point Management,
LTD.;" and

12

13
   g. $850.00 in UNITED STATES FUNDS that were seized from Wells

14
      Fargo/Wachovia Bank Account Numbers XXX-XXXXXXXXX0008,
XXXXXXXXXXXXX9425, XXXXXXXXXXXXX0008, and

15
      XXXXXXXXXXXXX7878, on behalf of "Thames Point Management,
LTD."

16

17      WHEREFORE, the United States requests as follows: That due process issue to

18  enforce the forfeiture of the Defendant Funds; that due notice be given to all interested

19  persons to appear and to show cause why forfeiture of the Defendant Funds should not be

20  decreed; that judgment be entered declaring the Defendant Funds forfeited to the United

21  States to be disposed of according to law; that the Court thereafter order the United States

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 18
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | Secret Service, or its contractor, to dispose of the Defendant Funds as provided by law;

2 | that the Defendant Funds be condemned as forfeited to the United States to be disposed

3 | of according to law; and that the United States be granted such other and further relief as

4 | the Court may deem just and proper.

5 |      DATED this 23d day of December, 2014.

6

7 |                           Respectfully submitted,

8 |                           ANNETTE L. HAYES
                          Acting United States Attorney

9

10

11 |                           LISCA BORICHEWSKI
                          Assistant United States Attorney

12 |                           United States Attorney's Office

13 |                           700 Stewart Street, Suite 5220

14 |                           Seattle, Washington 98101-1271
                          Phone: 206-553-2266

15 |                           Email: Lisca.Borichewski@usdoj.gov

16

17

18 |                           RICHARD E. COHEN

19 |                           Assistant United States Attorney

20 |                           United States Attorney's Office
                          700 Stewart Street, Suite 5220

21 |                           Seattle, Washington 98101-1271

22 |                           Phone: 206-553-4665
                          Fax: 206-553-6934

23 |                           Email: Richard.E.Cohen@usdoj.gov

24

25

26

27

28

## VERIFICATION OF COMPLAINT

STATE OF WASHINGTON      )
                            ) ss
COUNTY OF                    )

    I, William Marik, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

    I am a Detective with the King County Sheriff's Office, Shoreline Police Department, and a United States Secret Service Task Force Officer and have knowledge of this case. I have read the foregoing complaint and know the concerns thereof. I have furnished the information contained in the complaint based upon my involvement in the matter and that of other reliable Government sources and based on information and belief, the allegations contained in the complaint are true.

WILLIAM MARIK
Detective, King County Sheriff's Office
Shoreline Police Department
United States Secret Service Task Force Officer

    SUBSCRIBED and SWORN to before me this 22nd day of December, 2014, by William Marik.

Print: Jennifer M. Biretz
Notary Public in and for the
State of Washington, residing
at Seattle, King Co.
Expires: 7/4/15

VERIFIED COMPLAINT FOR FORFEITURE *IN REM* - 20
*U.S. v. $436,924.86 in U.S. Funds, et al.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970